# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN E. RIVKIN, M.D., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNION CENTRAL LIFE INSURANCE COMPANY; SHARP REES-STEALY MEDICAL GROUP INC. LONG TERM DISABILITY INSURANCE PLAN,<br><br>Defendants. | CASE NO. 09cv1136-WQH-JMA<br><br>ORDER |

HAYES, Judge:

The matters before the Court are the Motion for Summary Judgment filed by Defendants The Union Central Life Insurance Company ("Union Central") and Sharp Rees-Stealy Medical Group Inc. Long Term Disability Insurance Plan ("Plan") (ECF No. 26) and the Cross-Motion for Summary Judgment filed by Plaintiff Jonathan Rivkin, M.D. (ECF No. 29).

## I.  Background

It is undisputed that Plaintiff is disabled from his occupation as a physician since March 2003 and is insured under a group disability plan issued by Union Central to a multiple employer trust. Effective February 1, 2002, the Sharp Rees-Stealy Medical Group ("SRSMG"), Plaintiff's employer at the time, obtained a certificate of coverage under the multiple employer trust. It is undisputed that Plaintiff's predisability "Average Monthly Earnings" ("AME") were $18,114.26 and the gross benefit amount under the Plan was $7,245.71 (i.e., 40% of his AME). *See* ECF No. 26-1 at 10 (Defendants); ECF No. 29-1 at 6 (Plaintiff). It is undisputed that Plaintiff has a "Residual Disability," as that term is defined

1 in the Plan. It is undisputed that Plaintiff has worked in another occupation since the onset of
2 his disability, but Plaintiff at times has earned less than 20% of his AME, thereby entitling
3 Plaintiff to a "Total Disability Benefit" under the Plan. The parties dispute whether the Total
4 Disability Benefit may be offset by any portion of Plaintiff's "Current Monthly Earnings"
5 ("CME").

**A. Plan**

The SRSMG "Coverage Schedule" reflects that SRSMG chose the following Plan options:

> **Total Disability:** Option IV.
> ...
> **Integration Method:** ... Option I Direct Method ... see 'How is Your Total Benefit Calculated'.
> ...
> **Residual or Partial Disability Benefit:** Option VI – Residual Disability.
> **Return to Work Benefit:** 12 months – Option II.

(Admin. R. at 1355-56, ECF No. 30-8).

The Plan contains the following relevant provisions:

> **Option IV**
> **Total Disability or Totally Disabled** means during the Elimination Period and until You reach the end of Your Maximum Benefit Duration, You are unable to perform the material and substantial duties of Your Own Occupation due to an Injury or Sickness. Your Maximum Benefit Duration is shown on the Coverage Schedule.
> ...
>
> **Option VI**
> **Residual Disability** means as a result of Injury or Sickness which caused Disability, You are unable to perform the material and substantial duties of Your Own Occupation on a full-time basis, and You are:
>   1.   performing at least one of the material duties of Your Own Occupation or another occupation on a full-time or part-time basis; or
>   2.   performing each of the material duties of Your Own Occupation or another occupation on a part-time basis.
> ...
>
> **If Option VI, Residual Disability Benefits Apply, What Are The Qualifications To Receive A Total Disability Benefit?** You will be paid a Total Disability benefit if you:
>   1.   become Totally Disabled while insured under this Plan,
>   2.   are Disabled throughout the Elimination Period and remain Disabled beyond the Elimination Period;
>   3.   are under the care of a Physician who is providing treatment for the Injury or Sickness causing the Disability;
>   4.   submit proof of Disability satisfactory to Us; and

> 5. are employed, Your Current Monthly Earnings are less than or equal to 20% of your Average Monthly Earnings.
>
> ...
>
> **What Are The Requirements To Qualify For A Residual Disability Benefit?**
> If You are Residually Disabled and have Current Monthly Earnings in excess of 20% of Your Average Monthly Earnings, You will be paid a Residual Disability Benefit if You meet the following qualifications:
> 1. You satisfy the Elimination Period with the required number of days of Total Disability and/or Residual Disability and become entitled to receive LTD benefits under this Plan;
> 2. You submit satisfactory Proof of Disability to Us that You are Residually Disabled as defined in this Plan; and,
> 3. You are earning less than 80% of Your Average Monthly Earnings.
>
> ...
>
> **50% Offset of Earnings – (Option II)**
> **What Happens After 12 months of Return To Work Benefits Have Been paid?** After 12 months of Partial or Residual Disability Return To Work Benefits have been paid, We will calculate Your Monthly Benefit using the 50% Offset of Earnings method. To determine Your benefit, calculate Your Total Disability Benefit as shown in the section titled 'How Is Your Total Disability Benefit Calculated', Option I.... From the Total Disability amount determined, subtract 50% of Your Current Monthly Earnings. The amount remaining is Your Monthly Benefit.
> The sum of Your Monthly Benefit and Current Monthly Earnings may not exceed 100% of Your Average Monthly Earnings. If this sum exceeds Your Average Monthly Earnings, Your Monthly Benefit will be reduced by the amount in excess.
>
> ...
>
> **How Is Your Total Disability Benefit Calculated?**
> Your Total Disability benefit will be determined (see 'Integration Method' in the Coverage Schedule) as follows:
> **Direct Method – (Option I)**
> Take the lesser of:
> 1. Your Average Monthly Earnings multiplied by the Direct Benefit Percent shown in the Coverage Schedule [i.e., $7,245.80]; or
> 2. The Maximum Monthly Benefit shown in the Coverage Schedule [i.e., $10,000].
>
> From the lesser amount determined in 1 or 2 above, subtract all Other Income Reductions, including those for which You were eligible but did not apply or appeal as described in the 'Claim Provisions' section of this Plan.
> The result is Your Monthly Benefit.
>
> ...
>
> **What Are The Other Income Reductions?** Other Income Reductions are benefits You are eligible to receive from other sources due to Your Disability. If You receive benefits from any of the other sources listed below, they will be used to reduce Your Monthly Benefit.
> ...
> 8. Income from any work for pay or profit not considered either Partial or Residual Disability or Rehabilitative Employment.

*Id*. at 1364-69.

The final page of the Plan states:

> The person or entity administering the plan provisions of this Plan is a fiduciary and has full and complete authority, responsibility, discretion and control over plan administration. This includes, but is not limited to, the authority to: (1) construe and interpret this plan; ... [and] (3) determine the amount of plan benefits payable....

*Id*. at 1384.

### B. Plaintiff's Claim for Benefits

On May 15, 2003, Plaintiff submitted a claim for disability benefits to Union Central. *Id*. at 1263-74. The claim related to a knee injury sustained on May 1, 2003.

On June 23, 2003, Anna Christensen, a Union Central Specialist, informed Plaintiff by letter that Plaintiff's claim for Long Term Disability benefits had been approved. *Id*. at 1186. Plaintiff disagreed with Christensen's calculation of the amount of Plaintiff's benefits, and Union Central ultimately sustained Plaintiff's appeal and found that Plaintiff's predisability monthly income was $18,114.26 and the Long Term Disability benefit amount was $7,245.71. *Id*. at 1015.

On November 19, 2004, Joyce Wolf, a Union Central Senior Examiner, informed Plaintiff by letter that his Long Term Disability benefits would not be affected by income Plaintiff began earning in September 2004. *Id*. at 723. In accordance with the Plan, Union Central paid Plaintiff a "Return to Work Benefit" for 12 months, without offsetting any earnings Plaintiff made during that period. *Id*. at 1366.

On August 24, 2005, Wolf wrote Plaintiff and stated that "[t]he 50% Offset of Earnings will begin with your Sept[ember] LTD benefit." *Id*. at 602.

On February 14, 2006, Wolf wrote Plaintiff. Wolf stated:

> We have reviewed the calculations since you started to work on a part time basis. All of the calculations were done correctly except for the last months earnings for the month of November 2005. We used Residual calculations for the first twelve months. Then we incorrectly used the 50% Offset of Earnings Option II, but since you earned less than 20% of your Pre-disability Earnings, the correct calculation would be the Direct Method, because according to the Policy language you were totally disabled not Residually Disabled.

*Id*. at 559. Wolf quoted the Plan provisions set forth above, and then stated:

> As noted above, if your earnings are less than 80% and more than 20% you are eligible for the Residual Benefit, which at this point would be 50% Offset of

> Earnings. But you clearly earned less than 20%, therefore, you were eligible for Total Disability and that would be the Direct Method deduction.

*Id*. at 563. Wolf stated that Union Central was offsetting the full amount of Plaintiff's earnings for the month of November 2005 (i.e., $2,750.00), and Union Central would deduct the amount it overpaid Plaintiff in November 2005 from Plaintiff's February 2006 benefit payment. *Id*.

On February 17, 2006, a Union Central representative wrote in Plaintiff's claim file:

> [C]alled [claimant] at his request. He is considering not working any more because his earnings are below 20% and we take off 100% of his earnings. He would like to understand why the Policy is written that way. Explained that we administer his claim based on his Policy, we do not make decisions about how his Policy was written and why. [Claimant] understood. He does not feel that he should be working at this time as it does not benefit him financially, he will continue to be looking for other jobs to find a more profitable position.

*Id*. at 31.

On February 20, 2006, Plaintiff wrote Wolf. Plaintiff stated:

> Prior to your involvement with my claim, Anna Christensen was my claims contact at Union Central, and she explained this part of the policy to me very differently than what you are now interpreting. I did not keep a[] monthly profit and loss statement after my twelve month return to work period, because as per my personal notes of March 11, 2004, Anna Christensen explained to me that there would be NO OFFSET in my earnings until I exceeded 20% of my pre-disability earnings. Since that has not occurred in the period after my first twelve months attempting to return to work, I found no reason to keep a profit loss statement on a month by month basis.

*Id*. at 554. Plaintiff asked for the "exact dollars and cents that represents the 20% figure you referred to in your letter." *Id*.

On March 1, 2006, Wolf responded with the letter stating that "the 20% threshold of your pre-disability earnings ... is $3,622.85." *Id*. at 552.

On March 15, 2006, Plaintiff sent Wolf a letter in which he asked three hypothetical questions regarding how Union Central would calculate his benefits. *Id*. at 542.

On March 24, 2006, Wolf sent Plaintiff a letter and stated that "it is not our policy to answer hypothetical questions as it may not include all the information necessary to provide an appropriate response." *Id*. at 541. Wolf stated that Plaintiff's new claim examiner would be John DiSantis. *Id*.

On May 25, 2006, DiSantis sent Plaintiff a letter in response to Plaintiff's request for a review of Plaintiff's claim for benefits. *Id*. at 532. DiSantis stated: "[T]he calculation of

your LTD benefit for the period of November 1, 2004 through November 30, 2005 did not conform to the provisions of the Policy. Accordingly, there is an underpayment due you in the amount of $27,808.00." *Id*. Di Santis stated that "a check for the underpayment has been sent to you." *Id*. DiSantis stated that "[a]fter 12 months of Residual benefits, your monthly LTD benefit is reduced by 50% of your Current Monthly Earnings." *Id*.

On November 16, 2006, Plaintiff began working for Sharp Mission Park Medical Group, which later merged with Scripps Coastal Medical Group, where Plaintiff has continued to work to date. *Id*. at 479. Plaintiff asserts that, as of the filing date of the Motions for Summary Judgment, Plaintiff earns less than 20% of his predisability AME, thereby entitling Plaintiff to a "Total Disability Benefit" under the Plan.[1] (ECF No. 29-1 at 13). It is also undisputed that Union Central has continued to offset Plaintiff's earnings by 50% every month.

On May 26, 2009, Plaintiff initiated this action by filing a Complaint seeking "correction and payment of the past underpaid monthly benefits related to Plaintiff's own-occupation Total Disability, which have been improperly offset from Plaintiff's current earnings which have been below-20% Plaintiff's indexed predisability earnings, to date of judgment, and forward." (ECF No. 1 at 12).

On October 1, 2010, Defendants filed the Motion for Summary Judgment (ECF No. 26), and Plaintiff filed the Cross-Motion for Summary Judgment (ECF No. 29). On January 20, 2011, the Court conducted oral argument on the pending motions.

**III.    Standard of Review**

    **A.    Summary Judgment**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *See Anderson v. Liberty*

---

[1] Defendants contend that during five months in 2007 and five months in 2008, Plaintiff earned in excess of 20% of his AME but less than 80% of his AME. (ECF No. 26-1 at 14).

1 *Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of
2 the case.  *See id.* at 248.  "In considering a motion for summary judgment, the court may not
3 weigh the evidence or make credibility determinations, and is required to draw all inferences
4 in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th
5 Cir. 1997); *see also Simkins v. NevadaCare, Inc.*, 229 F.3d 729, 733 (9th Cir. 2000) (same, in
6 ERISA case).

7       **B.    ERISA**

8       It is undisputed that the Plan is governed by the Employee Retirement Income and
9 Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

10       "[A] denial of benefits is to be reviewed under a de novo standard unless the benefit
11 plan gives the administrator discretionary authority to determine eligibility for benefits or to
12 construe the terms of the plan.  Where ... the plan does grant such discretionary authority, we
13 review the administrator's decision for abuse of discretion." *Montour v. Hartford Life & Acc.*
14 *Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (quotations omitted).

15       The final page of the Plan, entitled "Information Regarding the Employee Retirement
16 Income Security Act of 1974," contains the following  notation at the bottom, "ERISA Plan -
17 Group Certificate."  (Admin. R. at 1384, ECF No. 30-8).  This page states:

18 > The person or entity administering the plan provisions of this Plan is a fiduciary
> and has full and complete authority, responsibility, discretion and control over
19 > plan administration.  This includes, but is not limited to, the authority to: (1)
> construe and interpret this plan; ... [and] (3) determine the amount of plan
20 > benefits payable....

21 *Id.*

22       Plaintiff contends that this language is not an effective grant of discretion because the
23 "Certificate" which is attached to the front of the Plan states that "[t]he Policy is part of the
24 contract between the Policyholder and the Insurer," and "[t]he certificate ... is not part of the
25 contract...." *Id.* at 1354.  Plaintiff contends:

26 > By the terms of the Contract, neither the opening Certificate nor the 'Group
> Certificate' appended to the end as a general statement of ERISA procedures,
27 > is not a part of the Contract.  In fact, the documents create a conflict about
> whether there is a grant of discretion or not, thus rendering any such grant
28 > completely ambiguous.... [T]his Circuit ... requires the conflict be resolved in
> favor of the insured.

1 (ECF No. 29-1 at 15 (citation omitted)).

2  Defendants contend:

3  Union Central issued a group disability insurance policy to the Union Central
Employee Security Benefit Trust. Participating employers were then issued
4  certificates to give to their employees with the benefits the individual employer
had selected or designated on the schedule page and the policy terms attached
5  thereto. Accordingly, there is an analytically distinct difference between the
ERISA plan established by SRSMG and the insurance policy purchased by the
6  multi-employer trust. The certificate of insurance issued to SRSMG is the
governing ERISA Plan document for SRSMG employees and that is where the
7  ERISA language is supposed to have been placed! Indeed, if one of the
employers applying for coverage through the Trust was exempt from ERISA (for
8  instance, because they were affiliated with a religious or governmental entity),
there would have been no reason to place the ERISA language in the certificate
9  issued to them.

10 (ECF No. 32 at 12-13 n.8).

11  The Court concludes that the above-quoted language is part of the Plan and

12 unambiguously confers discretion upon Union Central. The "ERISA Information" page is

13 expressly referenced in the table of contents of the Plan, unlike the "Certificate" attached to

14 the front of the Plan, which "is not part of the contract." *Compare* Admin. R. at 1354, ECF

15 No. 30-8, *with id*. at 1357; *cf. Roth v. Prudential Ins. Co. of Am*., --- F. Supp. 2d ---, 2010 WL

16 4641650, at *7 (D. Or. Nov. 5, 2010) (holding ERISA Statement did not effectively grant

17 discretion because ERISA Statement said, "[t]his ERISA Statement is not part of the Group

18 Insurance Certificate," and "[t]he ERISA Statements are not listed in the forms shown in the

19 Group Insurance Contracts' Table of Contents").

20  Plaintiff contends that even if the Plan language confers discretion upon Union Central,

21 de novo review is appropriate:

22  Union Central's vacillation back and forth between three different
interpretations—a new one with each new claims representative, and now
23  another through defense counsel—is not an exercise of discretion to which a
court can defer; i.e., *to which of the several contradictory positions* would the
24  Court give deference? The first one by specialist Christensen? The second one?
The third one? The new one argued during this litigation?

25
 Union Central never accompanied its numerous quoted sections of the
26  Policy with any explanation that would give the Court a rationale to gauge under
an abuse of discretion review.

27
(ECF No. 31 at 20; *see also id*. at 27 ("Such unstable contract application associated with three
28
opposite and ever-changing (to date) conclusions warrants *de novo* review, as there is nothing

consistent to which this Court could afford 'deference' even with enhanced skepticism under an abuse of discretion review were it applicable.")).

A plan administrator does not lose the discretion conferred upon it because it previously made an "honest mistake in plan interpretation." *Conkright v. Frommert*, 130 S. Ct. 1640, 1644 (2010) (holding that a plan administrator's approach to calculating the claimant's retirement benefits, which was first proposed in an affidavit to the district court after the court of appeals held that the administrator's previous approach was an abuse of discretion, was entitled to abuse of discretion review under ERISA). Union Central has submitted an affidavit from its counsel which states:

> Union Central's interpretation of the Plan during Rivkin's claim has been that Offset No. 8 allows it to deduct all income Plaintiff receives for pay or profit while he is disabled under the terms of the policy and his income is below the 20% threshold. That is how it intends to treat the claim going forward unless this Honorable Court instructs it to do otherwise.

(Suppl. Decl. Michael B. Bernacchi ¶ 5, ECF No. 34-1).

There is no evidence of bad faith in the different interpretations of the Plan by Union Central. There is no evidence that any failure by Union Central to adequately explain the rationale for its Plan interpretation was "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 982, 985 (9th Cir. 2005) ("[P]rocedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm."). Accordingly, the Court reviews Union Central's decision pursuant to the abuse of discretion standard of review. *See Conkright*, 130 S. Ct. at 1644.

Where, as in this case, "the entity that administers the plan ... both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," this "dual role creates a conflict of interest." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "[A] reviewing court should consider that conflict [of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Id.*; *see also Abatie*

*v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.") (en banc).

The Court of Appeals for the Ninth Circuit has stated:

> [T]he [reviewing] court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together....
>
> The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case.... Our court has implemented this approach by including the existence of a conflict as a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision....
>
> *Abatie* explained that the court should adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case. If those facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred.

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630-31 (9th Cir. 2009) (quotation and citations omitted); *see also Abatie*, 458 F.3d at 968-69.

After reviewing the record and the submissions of the parties, the Court finds that facts and circumstances of this case do not indicate that Union Central's conflict may have tainted the entire decisionmaking process. The Court reviews Union Central's decision with skepticism, but not enhanced skepticism.

## IV. Discussion

### A. Other Income Reduction No. 8

#### 1. Contentions of the Parties

Plaintiff contends that Plaintiff's "earnings level require[d] payment of a 'Total Disability Benefit' not a 'Residual Disability Benefit' and that the Plan prohibits calculation of a Total Disability Benefit that includes an offset of any of his earnings from Residual Disability employment." (ECF No. 29-1 at 6). Plaintiff seeks recovery from Defendants in the amount of all of the offsets taken plus interest. Plaintiff "estimates that the amount of improper offsets through December 10, 2010 ... will be approximately $94,831.52, and that it would, if continued unabated, increase monthly by approximately $1788.44 (i.e., the amount

of continued monthly offsets against [Plaintiff]'s <20% indexed AME)." *Id*. at 6 n.1.

Defendants contend:

> Rivkin was considered residually disabled under the Plan. However, the amount of income he earned while residually disabled defined what type of benefit he was to receive. Under the Plan, if an insured's earnings do not exceed 20% of his pre-disability average monthly earnings, it is not considered income from residual disability and he will be paid a 'Total Disability Benefit.' Conversely, if his monthly earnings are between 20% and 80% of his predisability average monthly earnings, it is considered income from residual disability and he will be paid a 'Residual Disability Benefit.'
>
> Page 8 of the Plan explains 'How A Total Disability Benefit Is Calculated.' It lets the employer select from two different methods. SRSMG selected the Direct Method of calculating total disability benefits. Under this formula, if an insured qualifies for a total disability benefit, he is entitled to receive 40% of Average Monthly Earnings prior to going out on disability, minus 'other income reductions.' Page 9 of the Plan then identifies the following 'other income reductions' for total disability benefits, including: '8. Income from any work for pay or profit not considered either Partial or Residual Disability or Rehabilitative Employment.' Given that under the Plan, income is only considered to be from residual disability if it is between 20% and less than 80% of the insured's predisability earnings, any income below 20% must necessarily be offset completely.

(ECF No. 26-1 at 17-18 (citations omitted)). Defendants contend that "Union Central's interpretation makes the most sense, comports with public policy, and is well within the discretion vested in the claims administrator for the SRSMG Plan." (ECF No. 32 at 4).

Plaintiff responds that Defendants' interpretation "impermissibly amend[s]/modif[ies] the contract by inserting into the definition of 'Residual Disability' a 20% or greater earnings level to be considered 'Residually Disabled'/'Residual Disability' employment. No such earnings qualifier exists in the actual definition for 'Residual Disability'/'Residually Disabled.'" (ECF No. 31 at 9 (emphasis omitted)). Plaintiff contends that "[w]hile it is true that CME of <20% of the AME entitles the employee to a 'Total Disability <u>Benefit</u>,' those monthly earnings (CME) are, by contract definition, <u>earnings from 'Residual Disability'</u> employment," and therefore should not be subtracted from the Total Disability Benefit as "Other Income Reduction[]" number 8.[2]

Defendants respond:

---

[2] "Other Income Reduction[]" number 8 provides that a claimant's Monthly Benefit will be reduced by "[i]ncome from any work for pay or profit not considered either Partial or Residual Disability or Rehabilitative Employment." (Admin. R. at 1369, ECF No. 30-8).

> [Plaintiff] asserts that the portion of the offset provision which states 'income from any <u>work</u> for pay or profit not considered either partial or residual disability or rehabilitative employment' necessarily means that <u>any</u> work he does while residually disabled cannot be offset. However, the term 'residual disability' modifies the word 'income' not 'work' in the sentence and residual disability income in the Plan is that income which is between 20% and 80% of one's predisability earnings. Indeed, if Rivkin's interpretation is correct, offset No. 8 would be **superfluous** because all the work he would be engaged in while disabled would necessarily have to be considered residual by nature.

(ECF No. 26-1 at 18).

Plaintiff responds:

> Defendants argue that Residual Disability encompasses any work performed for pay or profit while disabled. This is not the definition of Residual Disability. Residual Disability requires one be employed in an occupation (at least part time), and be able to perform at least some of the material duties of that occupation. Income from work for pay or profit that would not be income in the performance of an occupation, either full time or part time could include sick pay; income from employer's salary continuation plan; income from a rare task for a friend; income from sale of a poem or short story from hobby writing; severance pay for the voluntary termination of employment, but not for services, is pay which arises from employment but is neither Residual Disability nor 'work for pay or profit.'

(ECF No. 33 at 5 n.4 (citations omitted)).

Each party offers a policy argument in support of its position. Defendants contend:

> [T]he Plan was intended to incentivize people who are able to work to do just that. Indeed, that is why it has a return to work incentive clause. It is also why the Plan would necessarily offset less the more an insured works once the 20% threshold is reached. Conversely, under Plaintiff's interpretation the Plan would incentivize people who are able to work to not work.... The purpose of disability insurance is to offer income protection while people try to return to the workforce, not to incentivize them to stay out on disability. Plaintiff's interpretation, thus, goes against this public policy.

(ECF No. 26-1 at 21-22). Plaintiff contends:

> [T]he true incentive for a disabled physician to return to some other work—any work—is the fact that Union Central's coverage pays, at best, only 40% of the physician's predisability earnings ... less, for example, Social Security, Worker's Compensation, Retirement, State Disability.... Moreover, Union Central's approach to take a full offset of all work earnings (even though the CME is <20% of the AME) would undermine even the smallest of incentive to work. Under Union Central's approach, the disabled employee would work for free until his earnings exceed, if th[ey] ever do, 20% of his predisability earnings.

(ECF No. 31 at 24).

### 2.   **Analysis**

The following facts are undisputed. Plaintiff has a "Residual Disability," as that term

is defined in the Plan. (ECF No. 26-1 at 17 (Defendants); ECF No. 29-1 at 6 (Plaintiff)). Plaintiff has worked in another occupation since the onset of his disability. (ECF No. 26-1 at 17 (Defendants); ECF No. 29-1 at 6 (Plaintiff)). If/when Plaintiff earns in excess of 20% but less than 80% of his AME, Plaintiff is entitled to a "Residual Disability Benefit" instead of a "Total Disability Benefit." (ECF No. 26-1 at 7 (Defendants); ECF No. 29-1 at 9 (Plaintiff)). After the 12 months of Residual Disability Return to Work Benefits elapsed, when Plaintiff is entitled to a "Residual Disability Benefit," that benefit is calculated pursuant to the "50% Offset of Earnings" method in the Plan. (ECF No. 26-1 at 9 n.5, 14 (Defendants); ECF No. 29-1 at 6, 9, 20 (Plaintiff)). If/when Plaintiff earns less than 20% of his AME, Plaintiff is entitled to a "Total Disability Benefit" under the Plan. (ECF No. 26-1 at 17 (Defendants); ECF No. 29-1 at 9 (Plaintiff)). When Plaintiff is entitled to a "Total Disability Benefit" (as Plaintiff contends he was at the time of the summary judgment briefing), that benefit is calculated according to the "Direct Method" in the Plan, including subtracting all "Other Income Reductions." (ECF No. 26-1 at 7 (Defendants); ECF No. 29-1 at 6, 9 (Plaintiff)).

The parties dispute whether Union Central is entitled to subtract all of Plaintiff's wages pursuant to "Other Income Reduction[]" number 8 when calculating Plaintiff's "Total Disability Benefit." Other Income Reduction number 8 states that the Plan administrator will "reduce Your Monthly Benefit" by "[i]ncome from any work for pay or profit not considered either Partial or Residual Disability or Rehabilitative Employment." (Admin. R. at 1369, ECF No. 30-8).

In Other Income Reduction number 8, the term "Residual Disability" describes the type of "income" that will not be offset when determining a claimant's "Total Disability Benefit." Because Other Income Reduction number 8 is an offset to "Your Monthly Benefit," it is reasonable for Union Central to look to other offsets in the Plan in determining the meaning of "income from ... work ... not considered ... Residual Disability." (Admin R. at 1368-69, ECF No. 30-8). It is reasonable for Union Central to conclude that the type of income that will not be offset pursuant to Other Income Reduction number 8 is the type of income that would already be subject to a 50% offset pursuant to other terms of the Plan—in the case of a

Residually Disabled claimant, income that would entitle the claimant to a "Residual Disability Benefit," i.e., income that is in excess of 20% and less than 80% of a claimant's predisability Average Monthly Earnings. A contrary interpretation would render Other Income Reduction number 8 effectively meaningless given the Plan's broad definition of "Residual Disability." Defendants' interpretation of Other Income Reduction number 8—that "income from ... work ... not considered ... Residual Disability" (Admin R. at 1369, ECF No. 30-8) constitutes income that is 20% or less of a claimant's predisability Average Monthly Earnings—is a reasonable interpretation of the Plan. Viewing Union Central's interpretation with skepticism due to its conflict of interest, Union Central's interpretation is not an abuse of discretion. The Court concludes that Defendants are entitled to summary judgment as to this issue.

### B. Remaining Issues

A number of ancillary issues have been raised in the parties' summary judgment briefing, including whether the Plan requires a claimant's Average Monthly Earnings to be indexed and whether Union Central is entitled to recover any overpayment of benefits. To the extent these issues are the subject of the motions for summary judgment, the motions are denied without prejudice to renew the motion in light of the ruling in this Order.

## V. Conclusion

IT IS HEREBY ORDERED that, as to the interpretation of Other Income Reduction number 8, Defendants' Motion for Summary Judgment is GRANTED (ECF No. 26) and Plaintiff's Motion for Summary Judgment is DENIED (ECF No. 29). As to all other issues, the Motions for Summary Judgment are DENIED without prejudice. No later than thirty (30) days from the date of this Order, the parties shall file a joint status report identifying any remaining issues in this case.

DATED: March 2, 2011

**WILLIAM Q. HAYES**
United States District Judge